B. H. BASSETT v. C. PROETZEL ET AL.

1. JUDGMENT LIEN. — Under the act of November 9, 1866, entitled "An act to prevent judgments from becoming dormant, and to create and preserve judgment liens," though an execution may have issued within one year from the time when it might have issued, unless due diligence was afterwards used to enforce the lien, it was lost. A failure to sue out executions from year to year is a failure to use due diligence, in the absence of facts to excuse the neglect.

2. JUDGMENT LIEN — BANKRUPTCY. — The bankruptcy of a judgment debtor, who had years before his bankruptcy conveyed his interest in land to which the lien of a judgment of the district court of the state attached, and whose schedule of assets showed no claim thereto, presented no obstacle to the enforcement of the judgment lien against one holding the land subject to it.

3. JURISDICTION — BANKRUPTCY. — The state courts had jurisdiction to enforce liens on property in the hands of third parties, notwithstanding proceedings in bankruptcy against the principal debtor, and notwithstanding the discharge in bankruptcy of that debtor.

APPEAL from Washington. Tried below before the Hon. I. B. McFarlane.

Suit by appellant Bassett for an undivided half interest in a lot in the city of Brenham, to recover damages and for partition.

The cause was submitted to the court below as an agreed case, stipulating that the judgment should be for the plaintiff or defendants, according as the court should hold the law to be for the one or the other.

The case agreed is as follows:

" On the 21st day of October, 1859, one A. J. Gilder was the owner in fee of the undivided half interest in the lot in controversy, as described in the petition. On the said day one H. C. McIntyre recovered in the district court of said county of Washington a judgment against the said Gilder for $351.40, besides costs of suit. Executions were duly issued to said Washington county, December 1, 1859, April 3, 1860, and May 14, 1860, all of which were returned unsatisfied. In August, 1860, Gilder took the case to the supreme court by writ of error, and having executed the necessary supersedeas bond, further execution was stayed. On the 1st day of February, 1867, the supreme court affirmed the judgment of the district court with damages and costs, and executions were thereupon issued to Washington county as follows: August 5, 1868; July 1, 1869, and September 10, 1872. Under this last execution the Gilder one-half interest in the lot in controversy was levied on, and, by the sheriff of said county, duly sold to the plaintiff on the first Tuesday, being the 1st day of October, 1872; the purchase money was duly paid, and the sheriff executed to the plaintiff a deed therefor in the usual form. Gilder had sold his half interest in the said property to one W. G. Wilkins by warranty deed, duly recorded, dated November 19, 1859; and the defendant, Proetzel, holds under the said Wilkins by regular chain of title with warranty deeds, duly recorded, and the defendants were in possession of the property when the plaintiff bought, and so continue — Proetzel claiming as owner, and the other defendants under him as tenants.

" On the same day on which the McIntyre judgment against Gilder was rendered, October 21, 1859, J. H. Lauderdale also recovered in the district court of Washington county a judg-

ment against Gilder for $196.25 and costs, and on the 23d day of April, 1860, Gilder having sued W. G. Wilkins on his note for a deferred payment on the purchase of his half interest in the lot, obtained a judgment against him with a foreclosure of the vendor's lien on said half interest in the lot, for $464.12 and costs; and this last judgment was paid to the sheriff by said Wilkins, and a sufficient amount thereof, to wit, $240.07, was applied by the sheriff, October 14, 1860, to discharge the execution of Lauderdale against Gilder, then in his hands, and the lien of which had been kept alive by regular issuance of executions. On the 5th day of October, 1860, one J. A. Wilkins recovered against A. J. Gilder a judgment for $176.33 and costs; and this judgment, amounting to $190.43, was afterwards assumed and paid by W. G. Wilkins by consent of Gilder.

" On the said 21st day of October, 1859, the whole lot in controversy was covered by a frame building, worth about $1,000, and the rent of it was reasonably worth $400 per annum. On the 7th day of September, 1866 (the legal title to the lot being then in one J. A. Randle), this building was burned. Randle then sold the naked lot to Hellman, and Hellman sold it to defendant Proetzel, who, in 1869, without actual knowledge of the facts constituting plaintiff's rights, erected thereon the present building, at a cost of $3,300. Since that time the rent has been worth $100 per month. The whole lot, exclusive of the building, is worth $3,000, and it is not susceptible of partition without prejudice to the owners; so that should the court give judgment for the plaintiff for any interest therein, the decree may proceed to order a sale thereof to effect the partition. It is admitted that Proetzel owns the other undivided half interest in the lot, and the plaintiff makes no claim thereto. The defendant Proetzel, and those under whom he claims, have had the peaceable, quiet, uninterrupted possession of said lot, paying taxes on the same, from the date of the purchase by Wilkins, November 19, 1859, to the filing of this suit."

The foregoing agreement was made and signed by the attorneys on the 18th day of April, 1873. Subsequently, on the 5th day of February, 1874, the following agreement was filed, and over the objection of the plaintiff, as embodied in it, was considered by the court. This supplemental agreement and the exceptions thereto are as follows:

" It is admitted that the following facts existed at the time that the original agreed case was made up, and that they were known to the parties and their attorneys, that they were discussed at the time, and were omitted from the statement because they were then regarded as immaterial (because of the decision of the supreme court in Garnett *v.* Smith), and not through fraud, accident, mistake or ignorance. The defendants now desire to embody them as a part of the agreed case, and the plaintiff denies their right to do so, and refuses his assent thereto. And it is agreed that the said facts shall not be considered by the court, unless it should first hold that it is competent under the circumstances for the defendants, without the plaintiff's consent, to add to the case agreed on these additional facts."

" The said additional facts are as follows: Gilder filed his petition for an adjudication in bankruptcy in the United States district court for the western district of Texas, at Austin, May 29, 1868. Such proceedings were thereon had that he was first duly adjudged a bankrupt on the 21st of July, 1868, and afterwards was duly discharged from such debts as were provable in bankruptcy on September 22, 1869. The property in controversy was not included in his schedule of assets as rendered in said proceedings in bankruptcy, for the reason that he did not own or claim it at the time. McIntyre proved up his claim against Gilder in the bankrupt proceedings, claiming a judgment lien upon all the real estate in Washington county owned by Gilder at the date of the judgment, including the lot in controversy; and the bankrupt court, upon his application, in a proceeding to which the assignee of the bankrupt, Gilder, and the defendant, Proetzel,

and other purchasers of real estate in Washington county from Gilder were made parties, and the present plaintiff, B. H. Bassett, represented H. C. McIntyre, owner of the original judgment, as one of his attorneys, directed the clerk of the district court of Washington county to issue execution on said judgment of his said court against Gilder, and directed the sheriff of the said county to levy the same upon and sell any real estate owned by the said Gilder in Washington county at the date of said judgment, and subsequently disposed of by him prior to his filing his petition in bankruptcy, and upon no other property of said Gilder whatever. The execution under which the plaintiff bought the property in controversy was issued and levied and the property sold under said order of the bankrupt court. The plaintiff and the defendants were aware of these facts when the sale took place."

*Sayles & Bassett* for appellant.[1]

I. The main question to be considered is, whether or not the lien of the McIntyre judgment had been lost when the appellant purchased under it the half lot in controversy. If the judgment lien had been lost, the plaintiff (appellant) acquired no right by his purchase, and the judgment of the court below in favor of the defendants was correct, and should be affirmed. If, on the contrary, as we insist, the judgment lien was in force at the time of the execution sale, the plaintiff by his purchase took a good title to the lot, and was entitled to recover; and this court will render the judgment in his favor which the court below should have rendered. It will not be controverted that for twelve months, up to October 21, 1860, the McIntyre judgment, under which the plaintiff bought, held a lien upon the lot in controversy. If that lien was ever lost, it must have been by some act or omission subsequent to that time. In August, 1860, before the twelve months had yet

[1] But imperfect abstracts can be given of the briefs in this case, filed before the adoption of the rules. Their length, evincing much labor and research, renders it impossible to do justice to them in the report.

elapsed, Gilder took the case to the supreme court by writ of error, and, having given the necessary bond, the execution was superseded. Black *v.* Epperson, 40 Tex., 162. By positive provision of law, from the time of Gilder's suing out the writ of error in August, 1860, until January 1, 1868, the issuance of execution being prohibited, the plaintiff in the judgment was not chargeable with laches in failing to procure executions, and the judgment lien was in full force up to that date, and indeed up to the 1st of January, 1869, for, as already stated, under the proviso to Pasch. Dig., art. 7005, the judgment lien only " ceased and became inoperative in case execution was not issued within one year from the first day upon which such execution could by law be issued." So that if the execution was issued prior to January 1, 1869, the lien was in full force. Black *v.* Epperson, 40 Tex., 162. It is true that in Jones *v.* McMahan, 30 Tex., 733, the stay law was afterwards declared to be unconstitutional; but the citizen will not be charged with laches when acting in obedience to the positive mandate of the law-making power, although the law, when subsequently brought to the test of judicial construction, is found to be unconstitutional. Accordingly this court has held, in Hargrave *v.* Delisle, 32 Tex., 177, and in Cravan *v.* Wilson, 35 Tex., 52, that until they had, in the case of Jones *v.* McMahan, February 24, 1868, declared the stay law to be unconstitutional, no execution could be issued, and that the lien was preserved by the issuance of execution within one year thereafter. By positive provision of law and by repeated decisions of this court, the McIntyre judgment had a lien upon the lot in controversy until February 24, 1869, without execution. Before this period had elapsed, the execution of August 5, 1868, was issued, and subsequently that of July 1, 1869, and these unquestionably kept the lien alive for at least one year from this last date; that is, to July 1, 1870. We think we may safely assume that up to this latter date, adverse counsel will concede that the lien was valid; and we suppose that their chief reliance to defeat the plaintiff's recovery will be upon the fact

that more than three years were suffered to elapse between
this last named execution and that of September 10, 1872,
under which the plaintiff bought, and that thereby the judg-
ment lien was lost.

II. It is believed that the effect of the bankruptcy of Gilder
and the proceedings to enforce the lien in the federal court
would sufficiently excuse the neglect in any event. But we deny
that the existing law requires the issuance of execution from
term to term or from year to year, to keep the lien alive. We
insist, on the contrary, that the lien once acquired by the rendi-
tion of the judgment, and perfected by the issuance of execution
within the year, is not lost by the subsequent failure to issue ex-
ecution from term to term or from year to year, but remains in
full force, so long as the judgment itself is kept alive, and only
expires when the judgment becomes dormant, that is, when "ten
years have elapsed between the issuance of executions thereon."
Pasch. Dig., art. 7007.  *  *  *  The statute declares that the
*judgment* shall not become dormant unless ten years elapse be-
tween the successive executions. It does not declare that then,
or at any time, the *lien* shall cease to exist, but that the judg-
ment shall become dormant after a certain lapse of time. But
it is conceded that, when the judgment becomes dormant, the
lien is gone. What we deny is, that it can ordinarily, and in the
absence of special circumstances imputing gross negligence,
cease to be effective while the judgment itself is in full vigor and
capable of being enforced by execution, when the plaintiff has
done no affirmative act to waive his lien. The case of Bennett
*v.* Gamble, 1 Tex., 124, might seem to militate against this
view; but that decision was based upon the peculiar word-
ing of the law of 1840, Pasch. Dig., art. 3954, the proviso to
which not only required the execution to issue within the year,
but also required, what none of the later laws do, that "*due dil-
igence should be used to collect the same;*" and the court hav-
ing construed that "*due diligence*" to mean the issuance of
execution from term to term, they held the lien lost, because
the plaintiff had not procured them to be so issued. In Black
*v.* Epperson, 40 Tex., 162, decided March 23, 1874, opinion

by Gray, J., these views are affirmed and sustained on a very able argument. This law having been repealed by the law of 1842 already quoted, and all the later laws having conspicuously omitted the clause concerning due diligence, to which this construction had been given, it follows that the decision in Bennett *v.* Gamble is not pertinent to the question under discussion. And the same may be said of Hall *v.* McCormick, 7 Tex., 269, which was likewise made under the law of 1840, and based upon the meaning attached to the clause requiring the use of due diligence. But even in Hall *v.* McCormick the denial of the lien was placed by Hemphill, Ch. J., on the express ground that the judgment had become dormant, thus showing that he recognized the correctness of the principle for which we contend, that the lien did exist so long as the judgment was in force, and only ceased when the judgment became dormant. * * * [Counsel argued at length that the bankrupt proceeding strengthened instead of impairing plaintiff's right.] It is sufficient that in a proceeding to which the defendants were parties, a court of competent jurisdiction, by a decree which was in full force, and neither excepted to nor appealed from, ordered the lot in controversy to be sold, and that the plaintiff in this suit purchased at the sale so made. If under any circumstances the bankrupt court could have directed the sale, the presumption will be that the order made was authorized in the particular case. Poor *v.* Boyce, 12 Tex., 440; Burdett *v.* Silsbee, 15 Tex., 615; Alexander *v.* Maverick, 18 Tex., 179; Reid *v.* Allen, 18 Tex., 241; George *v.* Watson, 19 Tex., 354; Baker *v.* Cole, 20 Tex., 429; Nash *v.* Milburn, 25 Tex., 783; Brown *v.* Christie, 27 Tex., 73; Giddings *v.* Steele, 28 Tex., 732; Grant *v.* McKinney, 36 Tex., 62; Wells *v.* Polk, 36 Tex., 120; Reynolds *v.* McFadin, 36 Tex., 129; Harrison *v.* Oberthier, MSS. Opinions, April 10, 1874. If such presumptions would be indulged in support of judgments of the probate court — a court of limited and special jurisdiction — much more strongly may they be invoked in favor of the judgments of the district courts of the United States, which are courts of general jurisdiction. But under any circum-

stances, we may invoke the proceedings of the bankrupt court, to account for and excuse the failure to issue the execution from July 1, 1869, to September 10, 1872, should the court hold that the judgment lien would ordinarily be lost by the failure to issue execution from term to term or from year to year. * * * Nor can we perceive that plaintiff's right is prejudiced by the quiet, peaceable and uninterrupted possession of the defendants, up to the time of the execution sale and the subsequent filing of the suit. Since the defendant, Proetzel, held the legal title to the property, and neither the plaintiff in the judgment, nor the purchaser at the execution sale, had any right of entry or possession, it would be idle to discuss the three, five and ten years statute of limitations as a bar to the entry. The right of McIntyre, the plaintiff in judgment, was only that of an incumbrancer, with no claim to possession or to a reception of rents and profits. The plaintiff in this suit was a stranger to the whole proceeding, and had no right whatever until his purchase. If the defendant's possession up to that time was consistent with his title, as it clearly was; and if, as we think we have demonstrated, the plaintiff, by his purchase, acquired the better right by virtue only of the antecedent lien, the question of limitation is wholly foreign to the issue. Limitation only runs from the accrual of the right of action. As the plaintiff's right of action commenced with his purchase in 1872, and not before, limitation could only then commence. Suit was filed December 31, 1872, before yet even the shortest period of limitation of three years had run from the acceptance of the constitution by congress, March 30, 1870. Till then no limitation had run. The conclusion seems to us irresistible, that the plaintiff is entitled to a judgment for one-half the lot, and $50 per month, being one-half the rental value of the property.

*James E.* and *Seth Shepard* for appellee.

I. No title passed by the conveyance to appellant. Johnson *v.* Butler, 47 Tex., 423.

II. Appellant is barred by limitation. The appellee Proetzel and those under whom he claims have had the peaceable, quiet, uninterrupted possession of said lot, paying taxes on the same, from the date of the purchase by Wilkins, November 19, 1859, to the filing of this suit. The right, if it ever existed, is barred. Towns v. Harris, 13 Tex., 509. The statute began to run from the adverse possession of Wilkins (under whom appellee claims), November 19, 1859. Appellant's suit was filed December 31, 1872. Time from the date of adverse possession to March 4, 1861, 1 year, 4 months, 15 days. From March 30, 1870, to date of suit, 2 years, 7 months, 1 day. Time of running of the statute, 3 years, 11 months, 16 days.

III. The lien of the McIntyre judgment was lost before the levy and sale to appellant. 1. By the failure to issue execution in the interval of three years and two months between July 1, 1869, and September 10, 1872. 2. By general negligence in enforcing the lien. * * * Since the decision in Black v. Epperson (MSS. Opin., 1874), we must admit that the judgment rendered October 21, 1859, preserved its lien until January, 1868, because of the "stay law," and that it was kept alive by issuance of execution August 5, 1868, for one year, and was again kept up by the execution of July 1, 1869, for another year; but we contend that by the failure to issue again until September 10, 1872, the lien was lost on and after July 1, 1870. Towns v. Harris, 13 Tex., 515; Bennett v. Gamble, 1 Tex., 124; Scott v. Allen, id., 508; DeWitt v. Jones, 17 Tex., 622; Hall v. McCormick, 7 Tex., 269; Russell v. McCampbell, 29 Tex., 39.) There is a gap of three years, two months and ten days between the issuance of executions, and of two years, two months and ten days between the expiration of the lien, kept up by the first execution, and issuance of the last. * * * Reasoning from analogy, upon the most liberal construction to the plaintiff in judgment, it would require the issuance of executions within one year of each other. This is the view taken by Hemphill, C. J., of a similar statute. He says (DeWitt v. Jones, 17 Tex., 623): "The judgment becomes as dormant by the failure to issue executions in

the subsequent, as it does in the first year after its ren-
dition." ※ ※ ※

IV. The executions of August 5, 1868, and July 1, 1869,
were issued after Gilder's bankruptcy, and it is not pretended
that there was any order of the bankrupt court authorizing
their issuance, as in the case of the one under which the prop-
erty was sold. They were, therefore, null and void, and of no
effect or weight whatever; they were mere blanks under which
no right could arise or vest. Stemmons *v.* Buford, and other
authorities cited before. These executions being null and void,
then there was no execution issued on the affirmed judgment
of the supreme court within one year from February 1, 1868,
which has been decided to be the earliest moment that one
could have issued. Even under appellant's view of the effect
of the bankruptcy, the only valid, legal execution on the judg-
ment was issued September 10, 1872, just four years and
seven months after the earliest time that it could have issued;
and during this long period (within which appellee bought
and erected his improvements), McIntyre was guilty of the
grossest laches in the assertion of his lien in the bankrupt
court. This court has held, in the case of Black *v.* Epperson,
that the purchaser at sheriff's sale is affected by the laches of
the creditor in enforcing his lien.[1]

GOULD, ASSOCIATE JUSTICE. — The main question in this case
is settled by the decision recently made at the Galveston term,
in the case of Barron *v.* Thompson. That question is as to
what diligence was necessary to procure a judgment lien
under the act of November 9, 1866, entitled "an act to pre-
vent judgments from becoming dormant, and to create and
preserve judgment liens." Pasch. Dig., art. 7005.

The purport of the decision was that, notwithstanding the
issuance of execution within one year from the time when it
might have issued, unless due diligence were subsequently
used to enforce the lien, it is lost; and the failure subsequently

[1] Only such portions of the brief have been noticed as bear on the points
decided.

to sue out executions from year to year was held to be a failure to use due diligence, unless there was something in the facts of the particular case to take it out of the rule.

No question coming before the court within the experience of the writer has received a more careful consideration. This case, in which it was first presented, has been held up for years, and the question was again and again laboriously examined in the light of the authorities. In that examination, counsel for appellant and appellees have borne their full part, aiding the court by able and elaborate briefs and arguments, showing a degree of industry and research deserving commendation. It has so happened that the question has been first decided in another case, but the present is the case in which it was first presented and mainly considered.

There is no disposition on the part of any member of the court to reopen that question, and unless the bankruptcy of the judgment debtor, or the proceedings had by the judgment creditor in the bankrupt court, excused the failure to issue execution between July 1, 1869, and September 10, 1872, the lien of the judgment was lost.

In our opinion, the bankruptcy of the judgment debtor, who had many years before conveyed away whatever interest he had in the lot, and whose schedule of assets showed no claim whatever thereto, presented no obstacle to the enforcement of the judgment lien against one holding the lot subject thereto.

The jurisdiction of the state courts to enforce liens on property in the hands of third parties, notwithstanding proceedings in bankruptcy against the principal debtor, and notwithstanding the discharge in bankruptcy of that debtor, has been often upheld by this court. Elliott *v.* Booth, 44 Tex., 180; Boone *v.* Revis, id., 384; Hancock *v.* Henderson, 45 Tex., 485; Coffee *v.* Boll, 49 Tex., 25; Jackson *v.* Elliott, id., 62; Spring *v.* Eisenach, 51 Tex. 434; Doe *v.* Childress, 21 Wall., 642.

The enforcement of the judgment lien by execution from the court in which the judgment was rendered, could in no wise have interfered with the jurisdiction of the bankrupt court in administering the bankrupt's estate.

But if it were necessary for the judgment creditor to apply first to the bankrupt court before suing out execution, the delay in resorting to the measure is not sufficiently excused.

In our opinion the appellant failed to show a valid judgment lien, kept alive by due diligence, and failed to show a title superior to that of defendants. Accordingly the judgment is affirmed.

AFFIRMED.

[Opinion delivered June 21, 1880.]